May it please the court, my name is Noel Tinn. I'm here accompanied by my partner Emily Gladden and we represent the appellant Paul Burks. I'm going to limit my argument to the tax count unless the court directs otherwise because I think that's where the core of the issue likely is. There's a lot of paper here but I think that the core fact that's at the heart of the legal issue is that at the end of every business day, Zeke Reward affiliates got an award and the award was expressed in money. But the award could be taken anywhere from zero percent cash to a hundred percent cash. It could be taken in bids. It could be taken in some combination. But isn't the almost undisputed evidence in this record that if all of the affiliates had decided to cash in, there simply was not enough cash to pay them? Isn't that the core factual issue in the case? No, because that's what the government's claim is. But there's there's a number of responses that I think that we have. The first core response we have to that is that in fact, in terms of where the sufficiency argument lies, affiliates did withdraw daily and every single withdrawal that they requested was made. But secondly, because the promise was anywhere from zero to fifty percent of the net profits, there's an assumption that lies with that argument. The assumption is that that the program would have kept paying out at the same percentage even if everybody had requested withdrawal of whatever their amount was. And our testimony was that Mr. Burks had the discretion. He could award fifty percent of the day's net profits. He could award one percent of the day's net profits. And the fundamental assumption that underlies that argument is that he was somehow required to maintain the same level of return. And that's why there we think it's significant that there were so many disclaimers on the website, that there were no promises that would have justified such an expectation. And that's why we think that that argument is not necessarily dispositive of the issue. But even before we get to the sufficiency issue, the indictment put the entire question of constructive receipt at issue. And paragraph 37 said that Mr. Burks engaged attorneys and tax professionals to legitimize the issuance of 1099s. 37A says it had to be fraudulent because they had 108 million dollars reported on the 1099s and they only paid out 13 million in cash. And paragraph 28 says accountants and tax attorneys touted their advice and approval with regard to issuing forms 1099 for all constructive income received. And that's what we were trying to challenge pretrial. We were arguing that contrary to what the government's legal position was, that the doctrine of constructive receipt was not only legitimate and established in tax law, but that it applied here. And so we just had two different legal positions. The entire question of whether a 1099 has to reflect actual cash to an attorney depends on the resolution of the legal question of whether constructively received income can be reflected in a 1099. And if it is true that the doctrine of constructive receipt applies here, that means that you have to report income that is not cash. You have to report income just because they could have taken it even if they didn't. And you have to report income that reflects the fair market value of bids. But all of that, I think the district court was concerned that some of those issues simply require some factual analysis, which takes this to the point. There's no dispute that in terms of the elements of the offense, they were clearly articulated in the indictment. And so the district court felt that you had to get evidence to determine whether or not there was a charge. That's what a trial is all about. The way I read the district court's order is that the district court interpreted this as purely a question of proof. And I think that's what the government's arguing up here too. I think our position is that the fact that you had to get into some facts did not obviate the fact that you still have the question raised by the language of the indictment. That the malice opinion itself protects against the initiation of criminal proceedings on disputed tax issues. And that, in fact, if this is something that has to be decided by a matter of law, as a matter of law, by a district court, which we think the opinion requires, I think it's okay that the district court had to get into some facts, as long as the question the district court was getting at was what's the applicability of the tax laws to this particular case? And so I understand that the government has the position that we just said too much. We went too far. We went beyond Rule 12. We had this tax lawyer analyze the program from the website. I don't know what that means in and of itself, but it doesn't mean that we didn't say enough to trigger the district court's obligation to make a decision on the tax issue. We cited Treasury regulations. We cited tax court decisions. We did cite the opinion of a tax lawyer. All of these were legal arguments. The motion itself is nothing more, if you put aside the exhibits of the motion, it's nothing more than legal arguments about constructive receipt. And so the district court said, no, that is just questioning the proof. We felt otherwise. We hope this court finds otherwise. So, I mean, we weren't saying the government can't prove its case. We weren't saying we had a defense. We were saying that to the extent the indictment alleges that application of the constructive receipt theory was fraudulent, which it explicitly says that that is premised on a legal theory that's not right, that we should have had a decision on, that we should have been able to dispute in the district court. So I interpreted, I mean, I filed the motion and I've been doing this a little while, and I interpreted the case, Judge Wilkinson, I interpreted your opinion to mean that this is something that a court has to protect, if it is really, in fact, a due process protection against the initiation of criminal proceedings because there has to be a fair warning, that a court should and has to decide it when it's called to its attention. And we didn't put the constructive receipt language in the indictment. The government did. And so that was in play from the minute the grand jury returned this indictment. And we cited cases from, we did cite cases from other districts with a pure opinion and some other cases where defendants filed pretrial motions, making similar claims that we alleged here. Courts, I mean, there is definitely some analysis of some facts in some of these opinions. They're not dispositive. They're not from this circuit. But we did cite a series of opinions where district court judges get a motion like the one that we filed, and they do delve into some of the facts. And then they make a decision. And there's even a court from West Virginia that, you know, it goes through the M&R process with the magistrate, the M&R process, all before a jury is entailed. So we didn't think we were too far out of bounds in asking the district court to do that in this case. So I understand the government's position in part to be that, you know, as long as the indictment tracks the elements of the offense, that that's really all you need to see. I want to suggest that that's an overly broad reading of the due process claim like this to resolve it as well. That the question is ultimately whether we're just saying it doesn't state a claim, which is what the rule requires, and that it's just the only real question is whether there's a legal sufficiency issue. And this is not the traditional issue, but this is certainly one that this court recognized. The conspiracy, though, count four, had two objects. The 1099 is what everybody has really focused most of the brief writing on. But, you know, there is the second overt act, and of course that second overt act is the one the jury explicitly found. And that talks about these e-wallets and these foreign accounts. Now, so putting aside your 1099, if the government had not included the 1099 references in their conspiracy to evade the tax laws or whatever they call it, would you still have made the argument to dismiss? Yes, we would have made it because there was no evidence that this was evidence is what you find at the trial. This is, again, at the pleading stage, have they simply alleged as the overt act to support count four? This, they set up foreign bank accounts, and they use these e-wallets. And would you have been as able to come in and make? Oh, we would have, we would have been less able. It's hard for me to answer the question of what we would have done. It's the constructive. Right. Because that led to so much of the evidence that we think should have never come in. And so we were definitely focused on there. I will be the first to admit that overt act B is, we think it's problematic for another reason, which is that there was no evidence of it. And that there was no argument about it. And by the way, in case the court's wondering, when the verdict came in, we did, the jury created their own special verdict. We didn't request this, but it's what they did. And when the verdict was read, it was just read guilty. So we didn't even know until months later that the jury had done this. A little bit of background. So, but I don't think that the case law saying that Rule 12 review is limited to listing the elements renders moot the obligation to consider due process issues. I don't think any case stands for that. I don't think, as long as we're making an argument about legal sufficiency, I suggest to the court that we are complying with the limits of Rule 12. And in terms of sufficiency, in terms of what actually happened, there's only one witness who testified about what actually happened with the generation of these 1099s. And I quoted it, because it's the government's witness. It's the only witness. And it's, you know, Paul came to me, it's the person who generated the program that created the program. He said, I've been so focused on getting this done, I forgot we have to do 1099s. And so what happened is I had to quickly figure out a way to get the awards. So I wrote a program to do it. So whether they got the cash out and available, or they chose to use it to repurchase bids, it didn't matter. It was still just the award that was used. And that's the only evidence. There's no evidence of conspiratorial agreement to impede the collection of taxes, which is, of course, what we normally see. And that's why I think there's a disconnect between what the cases the government cites and the facts of this case. Because this, unlike most tax cases, is an allegation of a client conspiracy to report more taxable income than law requires. The entire theory of the indictment is that it was done to legitimize a fraudulent scheme. But what's absent when you have a fact pattern like that is something that would show, and no witness has certainly alleged it, there's nothing that I see that supports an inference, that what they were really trying to do was to impede the IRS. And so in this Mubaiyit opinion, you are permitted to make inferences. But what you have is one person after another over a 10-year period making false statements on Forms 990 about charitable purposes so they can get a tax deduction, when really they're there to foment jihad. And the Gambone opinion is, yes, there's an element of not having good books, but there's also falsifying W-2s to hide income. And every single time, every single fact pattern they're citing is somebody trying to hide income, because that's what normally happens when somebody's trying to impede the IRS. And this is, of course, the opposite. Of course, I'm sorry, the whole, it seems to me that the strategy in how you focus this appeal, that is to get rid of Count 4, I mean, you still have these other three counts of conviction. Right. The sentence imposed on Count 4 runs concurrent with those other three sentences and is, I believe, less even than what was imposed on them. So the benefit the defendant would receive if we were to reverse on Count 4 for whatever reason is then you're arguing that were it not for the evidence as to these 1099s and these other issues would not have come in. And the government has argued that whether Count 4 was there or not, almost everything that was presented at trial would have come in anyway. And I think you need to address it from my satisfaction to address that issue. Right. Well, in terms of failure to file individual and corporate returns, the district court wasn't going to let that evidence in, absent its relevance to the tax count. So that, categorically, was not going to come in. And the 1099 evidence that we think is the most unfairly prejudicial was the notion that our client was making affiliates pay tax on income that was unfairly making affiliates pay tax on income that they never earned. But fundamentally, the allegation, which they make time and time again even in this court, that they were misrepresenting actual income to the tune of $70 million. This, if you believe the government's theory, that's a very, very bad fact. In a case where we thought was pretty close. We thought we had evidence to rebut each allegation of the indictment. And just to give your honor one sense in my last 60 seconds, going down the indictment, it says that our client kept no books and records. We put up a CPA to say he had 11 terabytes and it was a good accounting system that at least gave him what he needed. There's allegations that it's a big Ponzi scheme. We put up testimony to say they promised half of the profits, they had $370 million, and $170 million in affiliate obligations when the doors closed. They put up, the indictment alleges that our client made up profit. We put up a CPA who does a regression analysis who says, no, there was a near perfect correlation between profit and what he actually paid out. And so there's no, what you normally have in a fraud case is the lie. And we felt like we were in a position where we were able to present evidence that suggested that maybe there wasn't the lie, but that tax count was a big lie on a very disputed tax theory. That's the impression that it created. And that's why we think we got hurt. Thank you, sir. Thank you, your honor. How did, in account for, generally, how did this behavior defraud or impact the IRS? I mean, it would seem to me that the chief victims here were the people who were required to pay tax on income that, as a practical matter, never received. I mean, normally, tax fraud cases are for people that fail to pay what they owe. And this one seems to have an unusual wrinkle. Can you explain that for me? I can, Judge Wilkinson. I agree. It has a little bit of an unusual wrinkle, but I want to make two particular points about that. First of all, the offense does not require exactly that the IRS be a victim. It requires that it impede with the proper assessment of income taxes, which it did. But the second point, which is perhaps more important, is the United States put on evidence that Mr. Burks didn't file tax returns. By his shifting all of this income to his victims, that necessarily reduced the amount of income that this pass-through entity would have had to report, were he to actually file his income tax. So he was the chief beneficiary. He was a beneficiary of this conduct. There's no question about it. And so it's not simply. But I think it wouldn't matter if he were or not, because the issue is, does it impede the proper collection of taxes? And what we have is somebody who is- And your basic view on that is that this kind of gross misallocation of income and shifting the burden on to the investors, as opposed to paying it himself, impedes the proper processes of tax collection. Yes. I think that the causing 9,000 improper tax documents, 1099s to be exact, necessarily impedes the proper assessment of income taxes. Period. Full stop. Now, in addition to that, it happened to have helped Mr. Burks. So I don't- There is an unusual wrinkle, and I will grant the court that. But I think that the United States charged this offense because it falls neatly under the statute. The statute applies. Now, I want to address Mr. Tin's argument that- I would say that this is constructive income. The whole thing rests upon the fact that the income is not available to the investors, because if they all made claims simultaneously, there wouldn't be enough to pay them. But how likely is it- I mean, this is the whole- I'm not sticking up for Ponzi schemes. They're terrible things. But the whole premise of them is that everybody's not going to present a bill and a come due bill at the same time. So it is an unusual wrinkle, but it doesn't rest on a kind of fictitious scenario. No, it doesn't, Judge Wilkinson, and I'll tell you why. And I would refer the court to page 2582 in the record. The defendant himself admits that in 2011, his company brought in $36 million, and that they reported- they caused almost $100 million to be reported. It didn't require that everyone come in and automatically request that money. We're talking about a tax year 2011. The company brings in $36 million, but somehow all of these individuals report a total income of almost $100 million. Those two things can't be true. That is a lie. That is false. And that is why this is- it didn't- this count doesn't actually require anything about everyone coming in to request money all at the same time. It's a discreet figure. How much money did that company bring in? $36 million. Then they couldn't possibly have had to report constructive income because- constructive receipt of income because there was a substantial barrier. They could never have gotten all of the money that they had to report on those 1099s. That's why some of the victims called up and said, how could this be? I never got any money. How could I possibly have to report thousands of dollars of income to the IRS? This is not a- the constructive receipt issue, and I want to address the motion to dismiss. The United States never thought- there's not been a dispute about the constructive receipt doctrine. In Malice, the primary case that they rely upon for the motion to dismiss, there was- the United States actually admitted and conceded in that issue that treasury regulation was unclear as it applied to the defendant's conduct. That's why there was a due process issue. There's no due process issue here because everyone agrees on the law. And if everybody agrees what the law says, then a decision on the motion to dismiss necessarily requires that we get into the adequacy of the proof. And that's not a proper determination. Mr. Tinn says, well, we thought it was okay because other district courts have looked at evidence. Well, fine. But in those cases, the United States did not say, district court, by the way, this is a Rule 12B motion, and you can't really consider anything outside the four corners of the indictment. And even if it's okay for him to ask, the district court did not err in that motion. And that's the issue before this court is, did the district court err? No. Whether or not he had some basis for asking, the district court properly denied that motion to dismiss. So let's look at the sufficiency of the evidence. Mr. Tinn says that only one- he has one government witness, Dan Oliveras, who said, this is how it happened. This is how those 1099s were issued. First of all, I note that the 1099 issue, the jury appears not to have even necessarily bought that evidence. Because they created their own special verdict relying on other evidence. But the United States presented multiple witnesses. It wasn't just Dan Oliveras' testimony. Kim Anderson testified that she worked- that Plyler came to her, Roger Plyler, who Burks described as his right-hand man. He's a signatory on all of the financial accounts, and he knows everything about his business. He's the one who addressed the person who approached, rather, the person who prepared the 1099s. She testifies, he came to me, I talked to him, I talked to Burks. That's who she was in communication with. That's how the 1099s were prepared. Dan Oliveras was responsible for finding the information that they needed, which was where were all these fictitious awards, all this money that didn't exist. But there were multiple witnesses that testified it, and the conspirators were not only Burks and Dan Oliveras, but also Don Oliveras and Roger Plyler. Mr. Tinn also suggests that in these cases, we always seem to have direct evidence of a conspiratorial agreement. Of course, this court knows that that's not true, and that we have many decisions from this court and others that recognize that in ordinary circumstances, the jury is going to have to infer a conspiratorial agreement. How much, just to get a handle on the numbers here, how much did the reporting of the fictitious income on the investors' 1099s, how much did that save Mr. Burks and his company? Well, presumably, In terms of taxes? It would be, I assume it would be the income that was shifted. So if that was real income, and $36 million of it at least was income, then by shifting that as income to the victims, he doesn't have to report $36 million as part of his pass-through entity for 2011. It got much worse in 2012, but we never got to the point where they were filing 1099s in 2012. And by that, I just mean that the company kept bringing in more and At the end of the day, it cost $755 million was the amount of victimization here. That's how much investors lost. So there was evidence, there was more than sufficient evidence from which a jury could reasonably find an agreement, overt acts, and an intent to impede the IRS. But even if there weren't, even if somehow count four goes away, the amount of evidence, and your honors have seen this very long record, and this was not the only lie that Mr. Burks told, I'm afraid. The government presented loads of evidence about the lies he told about this program. The money that they assert was always available. He says 50% of the profits were always available to dole out, and that they gave out about 50% of what came in. That's what came in to Zeek Rewards. But what was Mr. Burks telling everybody? They're not relying on Zeek Rewards money, because that would automatically be a Ponzi scheme. We know that's unlawful. They're saying the Zekler auctions, which lost at least $4 million, that that's where all this $3.3 billion came from. So there is no income that supports the assertion that 50% of the income that Paul Burks said is where it was coming from, Zekler auctions. No. The income they're referring to is the Ponzi scheme. So there's a lie there. He lied throughout about the nature of the scheme, about where the money was coming from, about how solid his company was, and he induced investors. The 1099 evidence is actually relatively small. It's only, you know, this trial transcript is somewhere around 2,600 pages. And I think that the 1099 evidence is a couple of hundred pages out of that. It's nothing compared to all the other evidence that went to the substantive, it's the fraud counts, the three fraud counts. So even if somehow this court were to hold that that shouldn't have been presented, and again, though, we still have the other part of the other overt act, and all of the evidence about the 1099 would have come in as evidence of intent. But you're saying basically that you impede the collection of taxes and account for it as a knowing, deliberate misallocation of income in itself throws a monkey wrench into the proper functioning of the tax collection system. Well, that's part of it, but I want to be clear. It's not just the misallocation of income. It's the absence of income. They were reporting income that didn't exist. They were reporting about- Affiliate income. Didn't exist. Well, income even to the company. The company only brought in $36 million. And according to the 1099s, they were reporting almost $100 million. So even if we take out sort of the impact on Berks, we have them reporting income that did not exist in the year 2011. And that is impeding the function of the IRS because it is necessarily having the IRS assess taxes based on income that never existed. So it's not just that it shifted it, although it did. I often wonder why prosecutors add these outlier counts when you have such a strong core case on the mail fraud or the wire fraud. Because what you've done in this case is created all of this extra noise and opened the case to vulnerabilities, this argument that by letting count four stay in the case, evidence came in that might not otherwise have been there. And then we have to evaluate whether or not that quantum of evidence was enough to perhaps have made a difference in the jury's evaluation. Why add the tax count? You know, the straightforward answer, and I understand Your Honor's question, and as the appellate advocate, I might sometimes be inclined to ask my colleagues the same thing. But the answer is, it's on all fours. We actually weren't putting anything at risk here. We weren't putting anything at risk. This tax count works. We charged it properly. We proved it. And I would suggest we proved it through a number of different witnesses. And then explain to me, how does the e-wallet and the foreign bank accounts, there wasn't much in the brief discussions about that, how does that help further the tax conspiracy? The evidence was that Birx had 13 different financial accounts. And this was evidence that was presented at trial. Thirteen financial accounts, all these e-wallets that happened, and no record keeping about income and expenses. No balance sheet. Mr. Tins says they had all this terabyte of information. Yeah, they had lots of information about how much false income they were allocating to their victims. They had not one iota of information about what it cost to run this scheme. Or what the income actually was. No balance sheet. So the government's evidence that related to the e-wallets was related to the failure to keep financial accounts. And combined with the fact that Mr. Birx never filed tax returns from 2009 through 2010 and only filed 2011 after the scheme was discovered. So the count for the question with respect to count for, it comes up to us, as I understand it, in a very narrow way. And that is, we're not looking into the jury verdict, we're not looking into the conduct of the trial, what we're looking at is simply whether the district court committed an error in declining to dismiss that count of the indictment. If I might, they also add, they do argue insufficiency of the evidence. So they do present that. I mean, their main argument was that it should have been dismissed as a matter of law at the indictment stage. And their responsive argument was no, this was very properly charged in terms of the exact elements of the statute. And I don't know that you can, you can't argue for dismissing the indictment based on evidence that came to light at trial. You know, that's never before a district court or a motion to dismiss the indictment. Which is precisely what we were arguing, because they were actually relying on evidence that was extra evidence beyond the indictment. But I do want to be clear and fair to Mr. Burks that they are challenging the denial of the motion for judgment of acquittal as well. So they are, they are, they are arguing more than just the denial of the motion to dismiss, which is why I'm addressing also the sufficiency of the evidence. But as far as the motion to dismiss the indictment is concerned, you can't, you can't just haul in a bunch of trial evidence. Exactly. And they did, they brought in this opinion letter from a tax attorney who was not well informed by the way about the nature of the scheme or what was happening. They brought in this letter of the tax attorney and referred in their motion to the opinion of experienced tax counsel. And they note that in the indictment, we, we mentioned the fact that they brought in, because they were trying to legitimize the scheme. That doesn't mean that we've opened up ourselves to a motion to dismiss. Was there any error, was there any assignment of error in how the case was actually presented to the jury or was there, or in terms of evidentiary rulings or whatever, I mean, it seemed to me like it was basically a fair trial. A very fair trial, Judge Wilkinson. There is one assignment of error that Mr. Tinn did not argue this morning related to the witnessing of completeness. That's right. But I, I have to say that. It's a pretty minor point and it's not correct. But as a, as a general matter, you can't say somebody was, when you look at how massive this record was, it strikes you sort of, well, I'm not sure that there's a denial of due process. No. When you have a record. Well not only that, but if your honor is to take a look at what Judge Cogburn did through this trial, I mean, he, he let them have a lot of their evidentiary wishes. You know, they, they. How long did the trial actually last? I don't remember, Mr. Tinn will know because he, he tried it, I want to say at least a few weeks is what I believe. It was a long trial. Judge Cogburn took a lot of time with those evidentiary objections and he certainly didn't act arbitrarily or capricious, capriciously. This was an immensely fair trial. Only kind of, the only error I, I, only assignment of error with respect to the conduct of the  Exactly. Which was, you know, sort of odd because he wanted to introduce evidence by virtue of cross-examination. Right. Rather than on the case sheet, but I, I thought to myself, this is a, you know, this trial went on this long and assembled this long a record and we, the only objection to the conduct of it is this 106 objection. Which was wrong. Right. And, and then we're saying at the end of the day that there's a, that there's a due process violation. When there's process upon process upon process that's piled on and assembles this huge record and you've got a district judge who's just enormously conscientious time after time. It, it seems to me, you know, at the end of the day, take a step back and the defendant here got what he deserved, which was a fair shake. You got a fair shake. A really fair shake. Could not say it better myself. Yes. I mean, this, this whole scheme just, it, it, it just from start to finish, nothing about it passes a smell test. And that's where the jury, that's what the jury, they, they understood this. They understood what was going on. I think so. I mean, I think their verdict actually reflects a careful review and I think that the defendant got a fair trial as evidenced by only one challenge to the way it was handled in terms of the evidence. Your honors, the government would respectfully request that the, this court affirm the judgment of the district court if there are no further questions. Thank you. Thank you. I think I'd like to start out by reminding the court that Judge Cogburn was the one who said, we may have to try this case again, and we quoted that from the record. It's true that we had a three week trial, but we had a lot of evidence on both sides. And in the fact that you should have had, I'm sure it should have been a three week trial. It was a complicated matter and you know, I'm glad you got every minute of trial that you received. It was... Excuse me, how long did the jury take to come in with a decision? They came in in one day. One day. And I'm going to, I didn't, it's a little bit from memory. I think about six hours. That's my... Six hours. Were there many questions? There were, there were some and I don't, my memory's just not good enough on that point. The yes, there were some. Doesn't six hours suggest to you that the jury didn't have a whole lot of trouble after two or three week trial in figuring out what they felt was the right decision? It's not in the record. I can tell you, Your Honor, what I think happened. I think they were split 6-6. But you're not, you're not complaining to us and I don't suggest that you should complain to us, but you're not complaining to us that you didn't receive what you needed to receive to put on a fair defense. That's right. But what we're complaining is that the due process violation happened before trial. And we're also complaining that the count never had sufficient evidence. I'll rest on the briefs on the 106 issue, but that's right. We're not saying we were prevented from presenting something that we should have. We didn't brief any of those issues. But what we are saying is that in a case that really was closed, that this sideshow that wouldn't have otherwise come in did prejudice us. And it prejudiced us, we think, because it gave the government something it could hang its hat on, so the government could say, this is the material misrepresentation. And if you, I mean, you've heard this argument, you can, I'm telling you what you already know, which is that every time they say the 1099s were false, our response is, no, because of this tax doctrine of constructive receipt, that a 1099 doesn't have to be the cash that goes into somebody's pocket. And that conundrum should have been resolved prior to trial. And instead, we're up here where the government's saying, this is false, and we're saying it's not, and their reason is factual and our reason is legal. And they may say that we're all on the same page about what the law requires. But every time the parties disagree about what a 1099 has to report, that's proof to the court that we're not on the same page. We weren't on the same page in the trial court before trial. We weren't on the same page in front of the jury. We're not on the same page now. And that's the issue, that we think this should have been resolved under Rule 12, and that this evidence should have never come in. I do want to address the argument that our clients somehow saved the business, we don't believe that's the case. But I don't think there's any record evidence that's going to substantiate that as a basis for finding a tax fraud conspiracy. And the core issue, of course, is whether there's any agreement among co-conspirators. And where this case is different than every case the government cites is in every other case, there's some inference that somebody is saving money, or that somebody is trying to impede the IRS. We don't see that here. Their witness didn't say that. No other witness said that. The entire theory of the indictment was that this tax fraud conspiracy was there to legitimize a fraudulent scheme. And that's what runs afoul of the Atkinson opinion and the Bode opinion from this circuit, because you can have a multiple object conspiracy, but one of the objects has to be to impede the IRS. So that's my argument. Mr. Tinn, I want to thank you so much for the effort and preparation you've devoted to this case. It's the court's most appreciated. Thank you, Your Honor. We will adjourn court and we'll come down and read counsel. The dishonorable court stands adjourned. Signed and died.
judges: J. Harvie Wilkinson III, William B. Traxler Jr., Leonie M. Brinkema